# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL INDICTMENT** |
| v. | **NO. 1:11-CR-230-5-JEC-GGB** |
| **LORI RENE ANDERSON,** | |
| **Defendant.** | |

## FINAL REPORT AND RECOMMENDATION

Defendant Lori Rene Anderson ("Defendant") is charged, along with her co-defendants, with conspiracy to distribute oxycodone, in violation of Title 21, United States Code, Section 846. Pending before this court is Defendant's Motion to Suppress Statements and Evidence [Doc. 217]. Defendant moves to suppress her statements made to agents on October 14, 2010, as well as a book that agents obtained during the interview, as fruits from an allegedly illegal seizure. An evidentiary hearing on this motion was held before me on January 17, 2012. All transcript references are to the transcript of that hearing. For the reasons discussed below, I recommend that Defendant's motion [Doc. 217] be **DENIED**.

**I.  FACTS**

In 2009, Drug Enforcement Administration ("DEA") Special Agent Christopher Mueller ("SA Mueller") began investigating forged prescriptions of oxycodone, a Schedule II controlled substance.  As of September 2010, the DEA had developed evidence that Kristen Goduto forged prescriptions for oxycodone and had devised and used methods whereby the prescriptions would be falsely verified if a pharmacy attempted to verify the prescription with the office of the purported prescribing physician.  (Tr. 7-9; Gov't Ex. 4).

On September 24, 2010, a confidential source ("CS"), working at SA Mueller's direction, went to Ms. Goduto's house at approximately 6:00 p.m.  (Tr. 50).  While the CS was with Ms. Goduto, Ms. Goduto engaged in conversations that confirmed that she knowingly was passing forged prescriptions.  Among other things, Ms. Goduto told the CS that there was a prescription ready to be picked up that day at a Sam's Club pharmacy.  (Tr. 12-14).

At approximately 6:47 p.m., Defendant arrived at Ms. Goduto's home. Defendant told Ms. Goduto that she had had a hard day at work.  (Tr. 14, 53).  The CS knew Defendant.  The CS had previously told SA Mueller, and SA Mueller knew from other sources, that Defendant worked in a doctor's office.  (Tr. 15).  SA Mueller also

knew that Defendant was a friend of Ms. Goduto. SA Mueller had seen Defendant's car previously at Ms. Goduto's home. (Tr. 24, 54). The CS left Ms. Goduto's home shortly after Defendant arrived. (Tr. 14).

On September 29, 2010, in order to investigate the information that Ms. Goduto had a recent prescription at a Sam's Club pharmacy, SA Mueller went to the Sam's Club pharmacy on Cobb Parkway. (Tr. 15-16). While there, SA Mueller reviewed all prescriptions for Schedule II controlled substances that were passed on Friday, September 24, 2010. Among those prescriptions, he found a prescription for 120 30mg oxycodone tablets purportedly written to "Mable Veitch" by Dr. Jeffrey Rubin of Physician Pain Care P.C. ("Physician Pain Care"). (Tr. 16-18; Gov't Ex. 2). A security video from the Sam's Club showed that on September 24, 2010, Kristen Goduto had dropped off the oxycodone prescription that had been submitted in the name of "Mable Veitch" at the Sam's Club pharmacy. (Tr. 23).

The Sam's Club pharmacist also located and provided to SA Mueller another prescription for oxycodone issued to Mable Veitch purportedly by Dr. Rubin of Physician Pain Care on August 18, 2010 and picked up on August 20, 2010. (Tr. 22; Gov't Ex. 3). In the middle of the August prescription was a handwritten notation, "Macy @ 3:05 "; a similar notation was made on the September prescription, "Macy

3

verified." (Gov't Exs. 2-3). The pharmacist explained that his pharmacy had called Physician Pain Care to verify the prescriptions, and a person named "Macy" at that office verified that their office had issued prescriptions for oxycodone to their patient, Mable Veitch. SA Mueller confirmed that the telephone number listed on the prescriptions was in fact the true telephone number for Physician Pain Care. (Tr. 18-19).

SA Mueller then called the number for Physician Pain Care and spoke to a woman who identified herself as "Lori." SA Mueller asked Lori whether Mable Veitch was a patient. Lori immediately told him that Mable Veitch was not a patient. (Tr. 19). Lori did not ask him to spell the patient's last name, did not ask for the patient's date of birth, and did not take any time to look up the name in the office computer. This immediate response was unlike any other SA Mueller had received during his investigation. Often, when SA Mueller called a doctor's office, the receptionist would put him on hold to get an office manager. SA Mueller usually had to give a lengthy explanation about what he was investigating. SA Mueller also usually had to give a date of birth for the patient about whom he was inquiring, and it normally took some time for the office manager/receptionist to look up whether the individual was a patient. In this instance, Lori immediately told SA Mueller that Mable Veitch was not a patient.

4

(Tr. 19-20). SA Mueller then explained his investigation, and asked Lori to notify Dr. Rubin that his name and office had been used in a forgery. On the day he called, SA Mueller did not know the number of patients seen at the office of Physician Pain Care. (Tr. 19-21, 24, 59).

After he left the Sam's Club, SA Mueller suspected that the "Lori" he spoke to at Physician's Pain Care may have been Lori Anderson, Ms. Goduto's friend who worked in a doctor's office. He then called Physician's Pain Care back and asked Lori for her full name. Lori responded that her name was Lori Anderson. (Tr. 24).

After receiving this information, SA Mueller drove to Physician Pain Care. When he arrived, he observed Defendant's car in the parking lot. (Tr. 24-25). Just before or right after he arrived, SA Meuller received a telephone call from Sonya Clark, the office manager of Physician Pain Care, who had been given his number by Lori Anderson. (Tr. 25). SA Mueller had several conversations with Sonya Clark that day and over the next several weeks. (Tr. 59-60).

Special Agent Mueller learned from Ms. Clark that Mable Veitch was not a patient and that Defendant had worked on Friday, August 20, 2010, and Friday, September 24, 2010, the dates the two Mable Veitch prescriptions were processed at Sam's Club. (Gov. Ex. 2 and 3; T. 56). Ms. Clark also told SA Mueller that the office

5

was closed on Fridays, but that Defendant worked on Fridays, sometimes by herself, and occasionally with other employees. (Tr. 25, 64, 74).

On October 5, 2010, Dr. Rubin called SA Mueller to tell him that he had fired Defendant. (Tr. 29). SA Mueller also learned from Ms. Clark that Defendant maintained a ledger that could contain confidential patient information. Ms. Clark told SA Mueller that the office wanted to obtain the ledger because of the confidential nature of the information it contained. (Tr. 27-28).

SA Mueller decided to try to interview Defendant on October 14, 2010. On that day, he and another agent went to Defendant's residence to attempt to interview her. They were together in an unmarked police vehicle and in plain clothes. They knocked on her door several times, but no one answered the door. They eventually gave up and started to walk back to their car. As they were leaving, they saw Defendant through a window. The agents then decided to wait to see if Defendant would leave her house. (Tr. 31-33).

About an hour later, Defendant left her house and drove to the intersection where the agents were parked. SA Mueller pulled up behind Defendant's car and turned on his blue lights. Defendant stopped, and SA Mueller approached her car and identified himself as a special agent with the DEA. (Tr. 33-34). SA Mueller told Defendant that

6

he stopped her because he would like to talk to her, but anything she said would be voluntary and she did not have to speak to him. He asked if they could go back to her house to talk. Defendant readily agreed to go back to her house and speak with the agents. (Tr. 34-35, 74).

Once at the house, Defendant invited the agents to come inside and offered them a seat in the living room. Before asking Defendant any questions, SA Mueller explained that she was not under arrest and that she did not have to answer any questions that she did not feel comfortable answering. (Tr. 38-39; Gov't Ex. 1).[1] After a few minutes of conversation, Defendant indicated that she still had the ledger with the names of patients to whom she spoke. When SA Mueller told Defendant that the doctor's office wanted the book back, Defendant responded, "Fine! They can have it." Defendant then left the room, retrieved the book, and gave it to the agents. (Tr. 40-43).

The interview lasted for about 1½ hours. Neither agent threatened Defendant or promised her anything in exchange for her interview. Defendant was never handcuffed and the agents never drew their weapons. Defendant was never restrained. (Gov't Ex. 1; Tr. 43).

---

[1] Government Ex. 1 is a video and audio CD that the agents made of the interview. (Tr. 37).

7

AO 72A (Rev.8/82)

## II.   DISCUSSION

Defendant seeks to suppress her statement to SA Mueller, as well as the book she provided during the interview, as being the fruit of an unlawful stop and seizure.

It is well settled that law enforcement agents may briefly detain individuals for purposes of investigating a crime if they have a reasonable, articulable suspicion based on objective facts that the individual has engaged in, or is about to engage in, criminal activity. See Terry v. Ohio, 392 U.S. 1, 21 (1968). "[T]he reasonableness standard requires that a police officer be able to point to specific and articulable facts, which, when taken together with rational inferences from those facts, reasonably warrant that intrusion." United States v. Mikell, 102 F.3d 470, 474-75 (11th Cir. 1996) (citing Terry, 392 U.S. at 21)(internal quotation marks omitted). See also United States v. Blackman, 66 F.3d 1572, 1576 (11th Cir. 1995) ("The reasonableness of the officers' conduct must be judged against an objective standard: would the facts available to the officer at the moment of the seizure or search warrant a man of reasonable caution in the belief that the action taken was appropriate.")(internal quotation marks and citations omitted).

AO 72A
(Rev.8/82)

Here, the issue in dispute is whether the agents had a reasonable suspicion sufficient to justify stopping Defendant. As discussed above, before stopping Defendant, the agents knew or could reasonably conclude that:

- Kristen Goduto was engaged in a conspiracy with others to obtain oxycodone by passing forged prescriptions for oxycodone at pharmacies;

- Two forged prescriptions for oxycodone purporting to be issued by Dr. Jeffrey Rubin at Physician Pain Care for "Mable Veitch" were filled at a Sam's Club Pharmacy on Friday, August 20, 2010, and Friday, September 24, 2010;

- The two forged prescriptions were verified by someone using the name "Macy" when the Sam's Club Pharmacy called Physician Pain Care on the above dates;

- Kristen Goduto picked up the oxycodone prescribed on the second "Mable Veitch" prescription from the Sam's Club pharmacy on September 24th or 25th;

- Lori Anderson worked for Physician Pain Care, and was at work on Friday, August 20, 2010, and Friday, September 24, 2010. The office was closed on Fridays, but Lori Anderson often worked on Fridays;

- Lori Anderson was a friend of Kristen Goduto and was at Ms. Goduto's house after work on September 24, 2010;

- When a DEA agent called Physician Pain Care on September 29, 2010 and asked Lori Anderson if they had a patient named Mable Veitch, Lori Anderson immediately responded that they had no such patient. The immediate response was unusual because Ms. Anderson did not ask for the spelling of the patient's name, other identifying information, or take time to look for information in the office records.

9

The above facts reasonably led the DEA agents to suspect that Defendant was the person who falsely verified that Physician Pain Care had issued the "Mable Veitch" prescriptions for oxycodone.

I have considered Defendant's arguments, including the facts that:

- SA Mueller stated that before the stop, he was not certain that Defendant was "fully complicit" in passing forged prescriptions;

- SA Mueller did not know whether other persons were present at Physician Pain Care on the dates the prescriptions were verified;

- There were no phone records linking Defendant directly to Ms. Goduto;

- Defendant told SA Mueller that there was no patient named "Mable Veitch"; and

- Defendant told Ms. Clark about SA Mueller's call and asked her to call him.

Nevertheless, the agents clearly had a reasonable suspicion that Defendant had verified the false "Mable Veitch" prescriptions purportedly from Physician Pain Care. Therefore, the stop was lawful.

Because the stop was lawful, Defendant's consent to the agents entering her home and her agreement to provide them with the book that contained confidential patient information were not tainted by any unlawful activity. Also, because Defendant was not in custody, it was not necessary for the agents to give Defendant *Miranda*

10

warnings before they questioned her.

### III. CONCLUSION

For the reasons stated above, I **RECOMMEND** that Defendant's Motion to Suppress Statements and Evidence [Doc. 217] be **DENIED**.

There are no other pending matters before me, and I am aware of no problems relating to the scheduling of this case for trial. It is therefore **ORDERED AND ADJUDGED** that this action be declared **READY FOR TRIAL**.

It is so **ORDERED** and **RECOMMENDED**, this 6th day of April, 2012.

*Gerrilyn G. Brill*
GERRILYN G. BRILL
UNITED STATES MAGISTRATE JUDGE

AO 72A (Rev.8/82)